FENNEMORE CRAIG, P.C.
Donald R. Gilbert (No. 003053)
Janice Procter-Murphy (No. 013078)
Kevin M. Green (No. 025506)
3003 North Central Avenue, Suite 2600
Phoenix, AZ 85012-2913
Telephone: (602) 916-5000
Email: dgilbert@fclaw.com
Email: jpmurphy@fclaw.com
Email: kgreen@fclaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Highway Technologies, Inc., a Massachusetts corporation,<br><br>Plaintiff,<br><br>v.<br><br>David Porter and Susan Porter, husband and wife; Rodd Jose and Barbara Jose, husband and wife; Sunline Contracting, L.L.C., an Arizona limited liability company,<br><br>Defendants. | No.<br><br>**VERIFIED COMPLAINT** |

Plaintiff Highway Technologies, Inc. ("HT" or the "Company") alleges as follows:

**Parties, Jurisdiction and Venue**

1.      HT is a Massachusetts corporation with its principal place of business in Illinois.

2.      Upon information and belief, defendant David Porter ("Porter"): (i) is a citizen of the State of Arizona; (ii) is a resident of Phoenix, Arizona; (iii) has caused events to occur in or around Phoenix, Arizona out of which this Verified Complaint arises; (iv) is married to defendant Susan Porter; and (v) at all material times was acting on behalf of himself and the marital community comprised of Porter and Susan Porter (together, the "Porters").

3.     Upon information and belief, defendant Rodd Jose ("Jose"):  (i) is a citizen of the State of Arizona; (ii) is a resident of Scottsdale, Arizona; (iii) has caused events to occur in or around Phoenix, Arizona out of which this Verified Complaint arises; (iv) is married to defendant Barbara Jose; and (v) at all material times was acting on behalf of himself and the marital community comprised of Jose and Barbara Jose (together, the "Joses").

4.     Sunline Contracting, L.L.C. ("Sunline") is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona.

5.     The amount in controversy in this action, exclusive of interest and costs, exceeds $75,000.00.

6.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1) and 18 U.S.C. § 1030.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

8.     As described more fully below, this Verified Complaint arises from competition, solicitation, misappropriation of confidential, proprietary and trade secret information, and other disloyal conduct engaged in by Porter and Jose, two of HT's trusted, high-level management employees.  Porter and Jose are now directly competing with HT for pavement marking contracts.  In addition, for a period of months prior to termination of their employment with HT, Porter and Jose used Company time, equipment and resources and devoted those resources to the establishment of a competing business.

9.     HT provides comprehensive highway safety services and products and engages in the manufacture, rental, sale, and installation of temporary and permanent traffic control devices and equipment, and contractor supplies.  In addition, HT bids for and works on highway construction projects, and pavement marking contracts throughout the State of Arizona and expands its business through the acquisition of competing businesses.

10.     The Company maintains a Phoenix Hub Office (the "Southwest Hub")

which serves as a major distribution center for HT products and services throughout Arizona, Las Vegas, Nevada, and parts of California.  In addition, the Southwest Hub occasionally undertakes projects in New Mexico and Texas.

### The Company Employed Porter and Jose Subject To Restrictive Covenants And HT's Business Practices Policy.

11.     Both Porter and Jose were highly trusted long-time management employees of HT and served as managing agents of the Southwest Hub until they voluntarily terminated their employment.  During his employment, Porter was appointed an attorney in fact for the Company, permitting him to enter into contracts on behalf of HT.  Jose was authorized to enter into contracts worth up to $400,000 on behalf of the Company.

12.     Most recently, Porter served as Hub Branch Manager (a/k/a Hub Director) of HT's Southwest Hub.   Before taking the Southwest Hub Director position, Porter worked as Branch Manager of HT's Denver Hub Office for approximately nine years and was employed by HT or its predecessors since July 1, 1983.  The Southwest Hub is the largest branch office in the HT network.

13.     Most recently, Jose served as Operations Manager for the Southwest Hub. Jose was employed at the Southwest Hub by HT and its predecessors for more than 20 years.

14.     In addition, because of their positions of authority within the Company, HT entrusted Porter and Jose with access to much of the Company's proprietary, confidential and trade secret information, including but not limited to, costs, pricing structures, profit margins and other financial information, customer and contact lists, and confidential bid estimates and other bid information (the "Confidential Information").

15.     As Hub Director of the Southwest Hub, Porter was responsible for oversight and management of all operations, as well as profits and losses for the Southwest Hub.

16.     As Operations Manager for the Southwest Hub, Jose was responsible for oversight and management of all field operations associated with the Southwest Hub. In this capacity, Jose served as the primary contact for many of HT's customers and worked

1   directly with HT's pavement marking crews.

2       17.    Together, Porter and Jose personified HT to its customers, contractors and

3   suppliers and were responsible for safeguarding HT's industry goodwill and reputation.

4       18.    After informing the Company of their intent to work out a two-week notice

5   period beginning on May 4, 2009, Porter and Jose left HT on May 5, 2009.

6       19.    During the 12-month period preceding May 5, 2009, the Company paid

7   Porter a base salary of $140,000.00.   Porter was the highest paid of any of HT's Hub

8   Directors.

9       20.    During the 12-month period preceding May 5, 2009, the Company paid Jose

10  a base salary of $117,821.60.  In addition, HT paid Jose a guaranteed bonus of $30,000.00

11  in March 2009.

12      21.    HT requires management, estimators and sales employees to agree to

13  noncompetition, nonsolicitation, and confidentiality covenants (the "Covenants") because

14  they have a unique ability to generate business and secure lasting customer relationships

15  afforded HT's managing agents as well as their unique access to virtually all of the

16  Company's Confidential Information, and the unique position of access to the

17  Confidential Information.

18      22.    HT was created in February 2007 when a private equity firm acquired the

19  Highway Technologies arm of United Rentals Highway Technologies ("UR").  As part of

20  this acquisition, the newly-formed HT assumed UR's rights under a number of

21  employment agreements, including but not limited to, an Employment Agreement entered

22  into by and between Work Zone Safety, Inc. (which merged into United on March 30,

23  2001) and Porter dated September 29, 1999 ("First Porter Agreement").

24      23.    Under the First Porter Agreement, Porter promised to "devote his full time,

25  attention and efforts to promote and further the business and services of [United]" and to

26  forego any other business activity.

27      24.    As part of HT's acquisition of UR, the Company also assumed UR's rights

28  under a March 31, 2006 Employment Agreement entered into by and between UR and

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

Jose (the "Jose Agreement"). A true and accurate copy of the Jose Agreement is attached hereto as **Exhibit A**.

25.     The Jose Agreement set forth certain terms and conditions of Jose's continued at-will employment and was supported by independent consideration, including: (i) a one-time payment of $10,000; and (ii) a promise to pay Jose 50% of the total compensation paid to him by the Company during the previous 12-month period in the event of his termination without cause.

26.     Under the Jose Agreement, Jose promised to "devote his full time, attention and use best efforts to promote and further the business and services of UR and to forego any other business activity.

27.     The Jose Agreement also prohibited Jose from "engag[ing] in any other business activity pursued for gain, profit or other pecuniary advantage without the prior written consent of the Company."

28.     On or about January 9, 2008, after managing HT's Denver Hub for several years, Porter relocated to Phoenix to assume responsibility for management of the Southwest Hub.

29.     On or about January 9, 2008, Porter and HT entered into an agreement that memorialized certain terms and conditions of Porter's continuing at-will employment with HT (the "Second Porter Agreement" and together with the First Porter Agreement and the Jose Agreement, the "Agreements"). The Second Porter Agreement was similar to those Porter had executed with HT's predecessors and was supported by independent consideration, including: (i) a promise by HT to pay certain expenses to assist Porter with relocation from Colorado to Arizona (the "Relocation Expenses"); (ii) a raise in his base salary of approximately $31,000; and (iii) a promise by HT to pay Porter his then current salary for 12 months in the event of his termination without cause. A true and accurate copy of the Second Porter Agreement is attached hereto as **Exhibit B**.

30.     Altogether, the Company paid or reimbursed Porter for covered Relocation Expenses in the amount of at least $87,796.68. Under the Second Porter Agreement,

1   Porter acknowledged and agreed that if he terminated his employment prior to the

2   expiration of a two-year period following January 9, 2008, he would immediately repay,

3   on a pro-rated basis, all of the Relocation Expenses previously reimbursed or paid by HT.

4          31.    Porter has terminated his employment with the Company but has not paid

5   HT a pro-rated portion of the Relocation Expenses as promised.  Accordingly, Porter is

6   indebted to HT for a pro-rated portion of the Relocation Expenses in an amount to be

7   proven at trial, but not less than $31,074.10.

8          32.    Under the Jose Agreement, Jose further agreed that during his employment

9   and for a 24-month period following termination of his employment he would not, among

10  other things:  (i) be employed by any person or entity who competes with HT in the

11  pavement marking business to any extent within a 200-mile radius of any HT location in

12  which he performed services during the 12-month period preceding his termination; (ii)

13  solicit or accept the business of any customer, supplier, manufacturer, finder, broker or

14  other person who had a business relationship with the Company or was a prospect for

15  such a business relationship; (iii) solicit or discuss the employment of any person who was

16  an employee of the Company at any time during the one-year period preceding

17  termination of his employment; (iv) solicit or encourage any employee of HT to leave the

18  Company; and/or (v) assist in the acquisition of any company which was, during the term

19  of the Agreements, researched by HT for possible acquisition by the Company.

20         33.    Under the Second Porter Agreement, Porter further agreed that during his

21  employment and for a 24-month period following termination of his employment he

22  would not, among other things:  (i) compete with the Company directly or indirectly in the

23  business of providing in whole or in part traffic control, flagging, sign and barricade

24  service, permanent installations, pavement markings, trench shoring or any related

25  business within a 200-mile radius of any HT location in which he performed services

26  during the 24-month period preceding his termination; (ii) solicit or accept the business of

27  any customer, supplier, manufacturer, finder, broker or other person who had a business

28  relationship with the Company or was a prospect for such a business relationship; (iii)

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

solicit or discuss the employment of any person who was an employee of the Company at any time during the one-year period preceding termination of his employment; (iv) solicit or encourage any employee of HT to leave the Company; and/or (v) assist in the acquisition of any company which was, during the term of the Agreements, researched by HT for possible acquisition by the Company.

34.    Under their respective Agreements, Porter and Jose each agreed that at all times during and after his employment with HT, he would hold in confidence and not disclose, use, or remove from Company property any Confidential Information, including but not limited to:  (i) business, pricing and management methods; (ii) financial strategies, systems and research; (iii) names of and arrangements with HT's customers, equipment suppliers, manufacturers, financiers; and (iv) technical information and work products.

35.    The Agreements provide that HT shall be entitled to injunctive relief to enforce the Covenants without any bond or security being posted, because monetary damages will be inadequate and the Company will suffer irreparable harm in the event of a breach of the Covenants.

36.    In addition to these contractual duties set forth in the Agreements, Porter's and Jose's employment with HT was subject to the Company's Business Practices Policy (the "Ethics Policy").

37.    The Ethics Policy requires that all employees keep confidential and not reveal HT's trade secrets, confidential, records, and other proprietary information including "computer programs, software, codes, financial information, pricing information, marketing data and plans, acquisition plans, other business plans, and design and engineering information."

38.    The Ethics Policy also prohibits all employees from engaging in conflict of interest transactions, including theft, fraud or deception against the Company, working in direct competition with any company in HT's line of business, and any transaction that might "[t]ake a business opportunity away from HT."

39.    The Ethics Policy also sets forth limits regarding HT employees' use of the

1   Company's property and provides that employees may not take, sell, trade, or give away

2   HT property for personal use or gain without proper authorization.

3       40.    On or about February 6, 2009, Porter acknowledged receipt of the Ethics

4   Policy and certified that he had not violated and would not in the future violate the "spirit,

5   intent, or provisions of this Policy." Porter's certification was false.

6       41.    Jose also received a copy of HT's Ethics Policy, but did not return an

7   executed signature page to the Company.

8           **Porter and Jose Resign From The Company After Misappropriating**

9                          **HT's Confidential Information.**

10       42.    On May 1, 2009, counsel for Porter and Jose electronically mailed a letter to

11   HT after close of business that stated:

12           Mr. Porter and Mr. Jose have decided to leave the Company. They

13   plan to submit their two-week notices as early as Monday, May 4. They
        intend to perform all of their normal duties and responsibilities through the

14   remainder of their notice period. They have not yet determined exactly what
        they will be doing after their departure, but they may end up working in

15   some capacity in the industry.

16       43.    In response to this letter, HT directed Shane Leonard ("Leonard"), Vice

17   President of Operations, and Scott Rehner ("Rehner"), Vice President of Information

18   Technology and Business Transformation Leader, to travel to the Southwest Hub to

19   interview Porter and Jose. On the morning of May 5, 2009, Leonard and Rehner

20   interviewed Porter and Jose.

21       44.    At the close of this interview, Leonard requested the return of the laptop

22   computers issued to Porter and Jose, and Rehner asked whether Porter and Jose had any

23   Company information on devices such as CD's, DVD's or USB drives.

24       45.    Porter and Jose each denied that they had any such information. These

25   statements were false.

26       46.    On May 5, 2009, HT sent a letter to counsel for Porter and Jose, demanding

27   that they take all necessary steps to preserve relevant evidence and immediately return to

28   HT any Company property remaining in their possession, including "any electronic media

1  storage devices." Neither Porter nor Jose responded to this letter, and neither returned any
2  such devices to HT.

3        47.    HT subsequently conducted a forensic examination of Porter's and Jose's
4  work-issued computers.  Through this examination HT determined that multiple
5  peripheral memory storage devices (the "Peripheral Devices") had in fact been attached to
6  Porter's and Jose's Company-issued computers.  Upon information and belief, Porter and
7  Jose attached the Peripheral Devices to their respective Company-issued computers.

8        48.    On May 18, 2009, HT wrote to Porter and Jose and demanded that they turn
9  over all Peripheral Devices that had been connected to their Company-issued computers,
10  including 12 Peripheral Devices specifically identified by serial number.  This was the
11  third time HT requested the return of Peripheral Devices connected to its computers.

12        49.    On May 18, 2009, legal counsel for HT also sent a letter via email to legal
13  counsel for Porter and Jose.  In the letter, counsel for HT demanded that Porter and Jose
14  "immediately turn over any and all portable media storage devices that were attached to
15  their HT-issued computers at any time during their employment with HT."  This was the
16  fourth time HT requested the return of Peripheral Devices connected to its computers.

17        50.    On May 20, 2009, counsel for Porter and Jose delivered one of the 12
18  specifically identified Peripheral Devices, a Maxtor 160 GB portable hard drive (the
19  "Maxtor").  Through their legal counsel, Porter and Jose denied that they had retained any
20  Peripheral Devices other than the Maxtor.  This denial was false, and Porter and Jose
21  continue to wrongfully retain HT's Confidential Information and trade secrets.

22        51.    On January 21, 2009, Porter attached an Ativa U3 Smart 2GB Peripheral
23  Device with serial number 0E214470A2019F1 (the "Ativa") to his HT issued laptop.  HT
24  specifically identified the Ativa and requested its return.  Through their legal counsel,
25  Porter and Jose have represented that the Ativa stopped working "six months ago" and
26  was discarded.  The Ativa contains HT's Confidential Information and trade secrets and
27  has not been returned to the Company.

28        52.    On no fewer than 16 occasions since January 21, 2009, Porter and/or Jose

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

have attached a Sony Peripheral Device with serial number 2A07100305147&0 (the "Sony") to their HT-issued computers. Porter and Jose each attached the Sony to his HT-issued computer on the morning of May 5, 2009, minutes before being interviewed by Rehner and Leonard. The Sony contains HT's Confidential Information and trade secrets and has not been returned to the Company.

53. HT has conducted a preliminary forensic examination of the Maxtor. The Maxtor was used by Porter to access and store significant quantities of HT's Confidential Information and trade secrets, including but not limited to: compilations of HT's nationwide customers and contact information; spreadsheets analyzing the Company's bids; and detailed financial analyses regarding the Company's customers and revenues generated by those customers since 2004.

54. In addition, it appears that HT's Confidential and trade secret information stored on the Maxtor may also have been accessed by others. The Maxtor has been attached to at least two other computers in addition to Porter's HT-issued laptop.

55. On April 23, 2009, using his HT-issued laptop and during normal working hours, Porter accessed the internet and searched the Google database for instructions regarding conversion and exportation of contact files in a new format.

56. On April 23, 2009, Porter transferred data files from his Company-issued laptop, including but not limited to a data file called "Contacts2.csv," to his personal Email account at dporter44@cox.net. This file directly matched the "Contacts" file located in the MicroSoft Outlook program on Porter's HT-issued laptop and is a compilation of HT customers, and employee contact information.

57. On April 23, 2009, using his HT-issued laptop during normal working hours, Porter accessed the internet and searched the Google database for instructions regarding conversion of PDF files into useable Excel spreadsheets. On April 23, 2009, Porter downloaded two software applications onto his HT-issued laptop that, upon information and belief, permitted him to convert PDF files containing HT's Confidential Information into useable Excel spreadsheets. Porter subsequently deleted those programs

from his HT-issued laptop.

58.     Porter also accessed and exported a number of HT's proprietary business process, workplace safety, human resources and other forms.  Porter then deleted those files from his HT laptop.

59.     In sum, using Company property during work hours, over a period of several months, Porter and Jose used the Peripheral Devices to access and store HT's Confidential Information and trade secrets.  Upon information and belief, Porter and Jose misappropriated HT's Confidential Information in order to enter the highway construction market with a competing business.

## Porter And Jose Have Entered The Highway Construction Market And Are Unfairly Competing.

60.     In addition to unauthorized removal of the Company's business forms, contacts, and other Confidential Information, Porter and Jose took all necessary steps to begin a competing commercial pavement marking business and began competing with HT while still employed with the Company.

61.     On or about March 12, 2009, Porter and Jose filed Articles of Organization with the Arizona Corporation Commission to form Sunline.

62.     On or about April 17, 2009, Sunline was granted license number ROC254708 by the Arizona Registrar of Contractors.  This license is classified as follows: "AE – COMMERCIAL PAVEMENT MARKING *EXCLUDES CRACK SEALING*."

63.     In April 2009, while still employed with HT using Company time and resources, Porter and Jose prepared a detailed business plan (the "Business Plan") to acquire one of HT's customers/competitors, KFM Striping & Curb Company, Inc. ("KFM").

64.     The Business Plan specifically analyzed the ability of KFM to compete with HT.  In relevant part, the Business Plan provides:

> During the past 20 years, [Porter and Jose] have worked closely with many of the General Paving Contractors in Arizona and have developed close personal relationships with them.  They have earned the trust of these

General Contractors and **have an understanding that these General Contractors want to do business with them and not the company they currently work for. This will allow business to migrate to KFM as bids are awarded to these General Contractors.**

\*      \*      \*

To make sure KFM wins our share of the business in this market, we will build on current relationships with General Contractors and estimate aggressively. We know all our competitors very well having bid against them for the past 20 years.

\*      \*      \*

In the Phoenix-metro market, there are 4 primary striping contractors that bid for public sector projects.

1.      Highway Technologies – revenue is approximately 8 million annually. . . . Their strengths include current fleet size (23 vehicles), staffing (26 field employees), the ability to obtain resources nationwide, and the relationships Rodd Jose and Dave Porter have built. **Their weaknesses include a strong reliance on [Porter and Jose] to bring in the business and a lack of experience in estimating. Highway Technologies is the leader in the Phoenix Metro market but are very susceptible if [Porter and Jose] leave . . . [.]** Dollar amounts bid range from $1500.00 up to but not limited to $1.5 million.

65.      Upon information and belief, Porter and Jose, while employed by HT, polled HT's customers to determine that these customers "want to do business with them and not [HT]."

66.      Upon information and belief, Porter and Jose have solicited and will continue to solicit other HT employees from the Southwest Hub.

67.      On Friday May 1, 2009, Jose held a private meeting with the Company's pavement marking field personnel to announce his departure from the Company.

68.      Upon information and belief, on the evening of Friday May 1, 2009, after resigning from the Company, Porter and Jose took several HT employees to dinner.

69.      In violation of their contractual duties, Porter and Jose are now competing with HT.

70.      HT has recently learned that Sunline submitted a successful bid on a pavement marking job on the Safford-Springerville Highway (US 191) Blackhills Road project on May 22, 2009. Sunline underbid HT, which was the second-lowest bidder, by

1    less than $1,200 approximately 2% of the total bid.  Upon information and belief, Sunline

2    also has underbid HT on at least one additional pavement marking project.

3        71.    HT recently learned that on June 4, 2009, Sunline purchased a bid package

4    for a pavement marking job at the intersection of U.S. Highway 70 and 8th Avenue in

5    Safford, Arizona (the "Safford Project").  Bids for this job were opened beginning on June

6    12, 2009.

7        72.    Upon information and belief, each of the projects described above and bid

8    on by Sunline were earmarked for bidding by HT while Porter and Jose still were

9    employed with the Company.

10       73.    Upon information and belief, unless enjoined, defendants will continue to

11   bid on jobs in competition with HT and trading on HT's confidential information and

12   goodwill.

13       74.    HT developed its Confidential Information and trade secrets at significant

14   time and expense.  HT's Confidential Information, including compilations of customers

15   and contact information, financial analyses, pricing structures and bid information derive

16   independent economic value from not being generally known to, and not being readily

17   ascertainable by proper means by, other persons who can obtain economic value from its

18   disclosure or use.

19       75.    HT makes reasonable efforts to maintain the secrecy of its Confidential

20   Information and trade secrets and stores that proprietary information on a password-

21   protected, secure server.

22                          **COUNT I**

23              **(Breach of Contract; Employment Agreements)**

24       76.    HT realleges and incorporates by reference each and every allegation in the

25   preceding paragraphs.

26       77.    The relationship between HT on the one hand and Porter on the other hand

27   was contractual in nature.

28       78.    The relationship between HT on the one hand and Jose on the other hand

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

1   was contractual in nature.

2        79.     The duty of loyalty is both an express and implied term of Jose's and

3   Porter's employment relationship with HT.

4        80.     Porter has breached the First Porter Agreement by, among other things,

5   failing to devote his full time, attention and efforts to promote and further the business and

6   services of HT.

7        81.     Porter has breached the Second Porter Agreement by, among other things,

8   failing to pay to HT a pro-rated amount of the Relocation Expenses.  As a direct and

9   proximate result of Porter's breach of the Second Porter Agreement, HT has been

10  damaged in an amount to be proven at trial, but not less than $31,074.10.

11       82.     Jose breached the Jose Agreement by, among other things, failing to devote

12  his full time, attention and efforts to promote and further the business and services of HT.

13       83.     As a direct and proximate result of Porter's and Jose's breaches of their

14  respective Agreements, HT has sustained and will continue to sustain actual and/or

15  consequential damages in an amount to be determined at trial.

16       84.     In addition to direct and consequential damages, as a result of the wrongful

17  conduct set forth above, under Arizona law, HT is entitled to an order that requires Porter

18  and Jose to forfeit and disgorge all of the compensation they received from the Company

19  during the time each was in breach of his duty of loyalty.

20       85.     In this regard, HT is informed and believes that:   (i) Porter should be

21  required to forfeit and disgorge all of the compensation he received from HT during the

22  period from at least December 15, 2008 through May 1, 2009, an amount not less than

23  $52,499.99; (ii) Jose should be required to forfeit and disgorge all of the compensation he

24  received from HT during the period from at least December 15, 2008 through May 1,

25  2009, an amount not less than $71,183.10.

26       86.     This action arises out of contract.  Pursuant to A.R.S §§ 12-341.01 and 12-

27  341, HT is entitled to its attorneys' fees and costs incurred in this action.

28                                  **COUNT II**

**(Breach of Confidentiality, Noncompetition and Nonsolicitation Covenants)**

87.     HT realleges and incorporates by reference each and every allegation in the preceding paragraphs.

88.     Upon information and belief, Porter and Jose have breached, are breaching, and will continue to breach the Agreements and the Covenants by, among other things: (i) using HT time, equipment and resources to establish a competing business; (ii) removing, using, and/or disclosing HT's Confidential Information and trade secrets in direct competition with the Company; (iii) failing to return to HT the Peripheral Devices as requested; (iv) soliciting KFM to enter into a competitive pavement marking business; (v) soliciting HT's customers within a 200-mile radius of the Southwest Hub; (vi) soliciting HT's employees for employment; and (vii) directly competing with HT by bidding  for pavement marking contracts and other traffic control jobs while trading on HT's Confidential Information and goodwill.

89.     As a direct and proximate result of Porter's and Jose's breaches of the Covenants, HT has sustained and continues to sustain immediate and irreparable injury, including but not limited to, loss of competitive business advantage, goodwill, opportunity and/or expectancy.

90.     There is a substantial risk that HT will continue to suffer irreparable harm unless Porter and Jose are enjoined from denying HT its rights under the Covenants.

91.     HT has no adequate remedy at law and is entitled to injunctive relief.

92.     This action arises out of contract.  Pursuant to A.R.S §§ 12-341.01 and 12-341, HT is entitled to its attorneys' fees and costs incurred in this action.

## COUNT III

### (Breach of Duty of Loyalty; Competition)

93.     HT realleges and incorporates by reference each and every allegation in the preceding paragraphs.

94.     As managing agents of HT, Porter and Jose owed the Company a duty of loyalty that prohibited them from, among other things: (i) using HT's time, equipment and

1    resources to establish a competing business; (ii) stealing from the Company; (iii) soliciting

2    HT's customers, including KFM, to engage in competitive business during the period of

3    their employment with the Company; and (iv) soliciting HT's employees for employment

4    during the period of their employment with the Company.

5          95.    Porter and Jose breached their duty of loyalty by, among other things:   (i)

6    using Company time, equipment and resources and, for a period of several months,

7    devoting substantial time to the establishment of a competing business; (ii) directly

8    competing with the Company during the period beginning on at least March 12, 2009,

9    when they formed Sunline and continuing; (iii) soliciting KFM to enter into a competitive

10   pavement marking business while working for HT and using the Company's Confidential

11   Information; (iv) polling HT's customers to determine whether those customers would

12   award work to KFM; and (vi) soliciting HT's employees for employment.

13         96.    As a direct and proximate result of Porter's and Jose's breaches of their duty

14   of loyalty, HT has been damaged in an amount to be proven at trial.

15         97.    Porter's and Jose's wrongful conduct set forth above was intentional,

16   aggravated and outrageous.  Porter and Jose breached their duty of loyalty with the intent

17   of causing injury to HT, or in conscious disregard of a substantial risk of significant harm

18   to the Company.  Punitive damages should, therefore, be awarded in an amount sufficient

19   to punish Porter and Jose and to deter others similarly situated from engaging in similar

20   conduct in the future.

21                                    **COUNT IV**

22         **(Breach of Duty of Loyalty; Misuse of Confidential Information)**

23         98.    HT realleges and incorporates by reference each and every allegation in the

24   preceding paragraphs.

25         99.    As former employees of HT, Porter and Jose owe the Company a continuing

26   duty of loyalty that prohibits them from using or disclosing HT's Confidential Information

27   and trade secrets in competition with the Company.

28         100.   Porter and Jose have breached their duty of loyalty by using and disclosing

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

the Company's Confidential Information to establish a competitive pavement marking business.   In operating a competing business, Porter and Jose inevitably will use and/or disclose the Company's Confidential Information and trade secrets and, thereby, continue to breach their duty of loyalty.

101.   As a direct and proximate result of Porter's and Jose's breaches of their duty of loyalty, HT has sustained and continues to sustain immediate and irreparable injury, including but not limited to, loss of competitive business advantage, goodwill, opportunity and/or expectancy.

102.   There is a substantial risk that HT will continue to suffer irreparable harm unless Porter and Jose are enjoined from breaching their duty of loyalty by using and/or disclosing the Company's Confidential Information to compete with HT and/or divert business away from the Company.

103.   HT has no adequate remedy at law and is entitled to injunctive relief.

104.   In addition and in the alternative to the irreparable harm set forth above, as a direct and proximate result of Porter's and Jose's breaches of their fiduciary duty of loyalty, HT has been damaged in an amount to be proven at trial.

105.   Porter's and Jose's wrongful conduct set forth above was intentional, aggravated and outrageous.  Porter and Jose breached their duty of loyalty with the intent of causing injury to HT, or in conscious disregard of a substantial risk of significant harm to the Company.  Punitive damages should, therefore, be awarded in an amount sufficient to punish Porter and Jose and to deter others similarly situated from engaging in similar conduct in the future.

## COUNT V

**(Breach of Fiduciary Duty; Misappropriation of Corporate Opportunity)**

106.   HT realleges and incorporates by reference each and every allegation in the preceding paragraphs.

107.   As highly trusted, managing agents of HT, Porter and Jose owed the Company a fiduciary duty to promptly disclose and not divert to themselves or any other

1   employer or entity any opportunity within HT's line of business and which HT might

2   reasonably avail itself of without first tendering that opportunity to the Company.

3        108.   KFM is a commercial pavement striping company operating within HT's

4   line of business, and HT has the financial ability to purchase KFM.  The acquisition of

5   KFM, developed while Porter and Jose were employees of the Company, is a corporate

6   opportunity properly belonging to HT.

7        109.   Porter and Jose did not disclose the opportunity to purchase KFM to the

8   Company, but diverted the opportunity to purchase KFM for their own benefit and have,

9   accordingly, misappropriated HT's corporate opportunity.

10       110.   As a result of Porter's and Jose's misappropriation of the opportunity to

11   purchase KFM, HT has been damaged in an amount to be proven at trial.

12       111.   Porter's and Jose's wrongful conduct set forth above was intentional,

13   aggravated and outrageous.  Porter and Jose breached their duty of loyalty with the intent

14   of causing injury to HT, or in conscious disregard of a substantial risk of significant harm

15   to the Company.  Punitive damages should, therefore, be awarded in an amount sufficient

16   to punish Porter and Jose and to deter others similarly situated from engaging in similar

17   conduct in the future.

18                                    **COUNT VI**

19                               **(Unfair Competition)**

20       112.   HT realleges and incorporates by reference each and every allegation in the

21   preceding paragraphs.

22       113.   For a period of months prior to termination of their employment with HT,

23   Porter and Jose used Company time, equipment and resources and devoted those

24   resources to the establishment of a competing business.

25       114.   Using the Peripheral Devices, Porter and Jose accessed HT's Confidential

26   Information and trade secrets during the course of their employment with the Company.

27       115.   Upon information and belief, Porter and Jose have used and/or disclosed

28   HT's Confidential Information and trade secrets in an attempt to acquire an interest in

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

1    KFM.

2         116.   These improper actions were calculated to injure HT in the marketplace.

3    Porter's and Jose's actions are unfair and wrongful and done with the intent of damaging

4    HT's business interests.

5         117.   Porter's and Jose's improper use of HT's time, equipment, Confidential

6    Information, trade secrets and other resources to compete with the Company constitutes

7    unfair competition.

8         118.   As a direct and proximate result of Porter's and Jose's conduct, HT has

9    sustained and continues to sustain immediate and irreparable injury, including but not

10   limited to, loss of competitive business advantage, goodwill, opportunity and/or

11   expectancy.

12        119.   There is a substantial risk that HT will continue to suffer irreparable harm

13   unless Porter and Jose are enjoined from unfairly competing with the Company and using

14   and/or disclosing the Company's Confidential Information to compete with HT and/or

15   divert business away from the Company.

16        120.   HT has no adequate remedy at law and is entitled to injunctive relief.

17        121.   In the alternative, and in addition to the irreparable harm set forth above, as

18   a direct and proximate result of Porter's and Jose's unfair competition, HT has been

19   damaged in an amount to be proven at trial.

20                                  **COUNT VII**

21                        **(Misappropriation of Trade Secrets)**

22        122.   HT realleges and incorporates by reference each and every allegation in the

23   preceding paragraphs.

24        123.   During their employment with HT, Porter and Jose had access to trade

25   secrets on the Company's password protected computer network, including compilations

26   of contact and customer lists, bid information, costs and profit margins and other financial

27   information.

28        124.   This information derives independent economic value from not being

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

1   generally known to, and not readily ascertainable through proper means by, other persons

2   who can obtain economic value from its disclosure or use.

3       125.   HT uses reasonable efforts to maintain and protect its trade secrets.  Porter

4   and Jose knew the Company did not permit the improper removal, use, or disclosure of

5   any of its trade secrets.

6       126.   On information and belief, Porter and Jose have used and disclosed and are

7   likely to use and disclose, in the normal course of their pavement marking business, some

8   or all of HT's trade secrets for the benefit of their new business and in competition with

9   HT.

10       127.   In operating a competing business, Porter and Jose inevitably will use and/or

11   disclose the Company's Confidential Information and trade secrets and, thereby, continue

12   to breach their duty of loyalty.

13       128.   Porter's and Jose's actions violate the Arizona Trade Secrets Act, A.R.S. §

14   44-401 *et seq.*

15       129.   As a direct and proximate result of Porter's and Jose's misappropriation of

16   HT's trade secrets, HT has sustained and continues to sustain immediate and irreparable

17   injury, including but not limited to, loss of competitive business advantage, goodwill,

18   opportunity and/or expectancy.

19       130.   There is a substantial risk that HT will continue to suffer irreparable harm

20   unless Porter and Jose are enjoined from using and/or disclosing the Company's trade

21   secrets.

22       131.   HT has no adequate remedy at law and is entitled to injunctive relief.

23       132.   In the alternative, and in addition to the irreparable harm set forth above, as

24   a direct and proximate result of Porter's and Jose's misappropriation of HT's trade secrets,

25   HT has been damaged in an amount to be proven at trial.

26       133.   Upon information and belief, Porter and Jose have acted willfully and

27   maliciously in misappropriating HT's trade secrets to the Company's detriment.

28   Accordingly, HT is entitled to its reasonable attorneys' fees under A.R.S. § 44-404(3) and

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

1 | exemplary damages under A.R.S. § 44-403(B).

2 | ## COUNT VIII

3 | ### (Computer Fraud and Abuse Violation)

4 | 134.    HT realleges and incorporates by reference each and every allegation in the
5 | preceding paragraphs.

6 | 135.    HT stored its Confidential Information and trade secrets on a Company
7 | computer network subject to password protection.   HT's network and computers are
8 | protected computers within the meaning of 18 U.S.C. § 1030(e)(2)(B).

9 | 136.    Porter and Jose intentionally accessed HT's network and accessed the
10 | Company's Confidential Information and trade secrets without authorization, and by
11 | exceeding authorized access, obtained HT's Confidential Information from the network.

12 | 137.    Porter and Jose also deleted, removed and destroyed information,
13 | documents and/or data contained on HT's protected computers and knowingly caused the
14 | transmission of a program, information, code or command.  As a result of such conduct,
15 | Porter and Jose intentionally caused damage without authorization, to protected
16 | computers.

17 | 138.    HT has conducted a costly forensic examination of Porter's and Jose's
18 | Company-issued computers to determine the extent of the damage and loss caused by
19 | unauthorized access to its computers and network.

20 | 139.    The damage or loss from removing and/or deleting Confidential Information
21 | from HT's network, as well as transmission of a program, information, code or command
22 | is at least $5,000.00 in the aggregate.

23 | 140.    Porter's and Jose's acts violated 18 U.S.C. §§ 1030(a)(2)(C) and 1030(a)(4).
24 | HT may maintain a civil action against Porter and Jose for compensatory damages,
25 | injunctive relief, and other equitable relief under 18 U.S.C. § 1030(g).

26 | WHEREFORE, HT prays for:

27 | A.      A temporary restraining order, preliminary injunction and permanent
28 | injunction:  (i) enjoining Porter and Jose for a period of two years within a 200-mile

radius of the locations where Porter and Jose performed services for HT:   (a) from engaging in any competitive pavement marking or traffic control business; (b) from soliciting individuals or entities that were customers, suppliers, manufacturers, finders, and/or brokers in a business relationship with the Company during Porter's and Jose's employment with HT; (c) from soliciting HT employees and/or encouraging any person to leave the Company; (d) from calling upon or assisting in the acquisition of any company that was selected by HT for possible acquisition; and (e) from using and or/disclosing the Confidential Information and/or HT's trade secrets to divert or attempt to divert business opportunities from the Company; and  (ii) requiring Porter and Jose immediately to return to HT any and all of the Company's Confidential Information in their possession or control, including any hard copies or electronic copies thereof; and;

B.      A judgment against all Defendants, jointly and severally, awarding HT compensatory, general and special damages, if any, in an amount to be determined at trial;

C.      A judgment against the Porters' marital community requiring the Porters to: (i) pay a pro-rated portion of the Relocation Expenses in an amount to be proven at trial, but not less than $31,074.10; and (ii) disgorge and turn over to HT all of the compensation Porter received from the Company during the period from at least December 15, 2008 through May 1, 2009, an amount not less than $52,499.99;

D.      A judgment against the Joses' marital community requiring the Joses to disgorge and turn over to HT all of the compensation Jose received from the Company during the period from at least December 15, 2008 through May 1, 2009, an amount not less than $71,183.10;

E.      A judgment requiring Porter and Jose to tender the opportunity to purchase KFM to the Company;

F.      Punitive damages in an amount sufficient to punish Porter and Jose and to deter them and others similarly situated from engaging in similar conduct in the future;

F.      An award of reasonable attorneys' fees and costs incurred pursuant to A.R.S. §§ 12-341.01 and 12-341;

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

1      G.     An award of pre- and post-judgment interest as allowed by law; and

2      H.     Such other relief as the Court deems proper.

3      DATED this 17th day of June, 2009.

                                  FENNEMORE CRAIG, P.C.

By *s/ Donald R. Gilbert*
          Donald R. Gilbert
          Janice Procter-Murphy
          Kevin M. Green
          Attorneys for Plaintiff
          Highway Technologies, Inc.

2207416.1/26881.003

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

## VERIFICATION

STATE OF ARIZONA    )
                              ) ss.
County of Maricopa    )

I am the Vice President of Operations for Highway Technologies, Inc. ("HT"); I am over 21 years old; I have personal knowledge of the facts stated below; and I have authority to testify on behalf of HT. I have read the attached Verified Complaint (the "Complaint") and I have personal knowledge of the facts stated therein. All allegations contained in the Complaint are true, except those made on information and belief, which I believe to be true.

Dated: June 17, 2009.



_____
Shane Leonard

SUBSCRIBED AND SWORN to before me, the undersigned Notary Public, on June 17, 2009 by Shane Leonard on behalf of Highway Technologies, Inc.

_____
Notary Public

My Commission Expires:

JONI LAWRENCE
Notary Public, State of Arizona
Maricopa County
My Commission Expires
July 19, 2010

2207852.1